(Slip Opinion) OCTOBER TERM, 2025 1

Syllabus

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## NATIONAL REPUBLICAN SENATORIAL COMMITTEE ET AL. *v.* FEDERAL ELECTION COMMISSION ET AL.

CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE SIXTH CIRCUIT

No. 24–621. Argued December 9, 2025—Decided June 30, 2026

The Federal Election Campaign Act (FECA) restricts a political party's spending on campaign activities in coordination with candidates. 52 U. S. C. §30116(d). In 2001, this Court upheld those coordinated-expenditure limits as consistent with the First Amendment. See *Federal Election Comm'n* v. *Colorado Republican Federal Campaign Comm.*, 533 U. S. 431 (*Colorado II*). Petitioners—a group of candidates and political party committees—challenged FECA's political-party coordinated-expenditure limits under the First Amendment, arguing that *Colorado II* is no longer good law. In light of *Colorado II*, the en banc U. S. Court of Appeals for the Sixth Circuit rejected petitioners' First Amendment challenge. This Court granted certiorari.

*Held*: FECA's political-party coordinated-expenditure limits violate the First Amendment. Pp. 6–26.

(a) The Court has jurisdiction under Article III. At the outset of the litigation, at least one of the plaintiffs—then-candidate for Senate JD Vance—undisputedly had standing. Vice President Vance still maintains an active "Statement of Candidacy" on file with the FEC indicating his intent to run for Senate in 2028, as well as a campaign committee that has raised money for a Senate race, establishing that this dispute is justiciable. Pp. 5–6.

(b) The First Amendment provides that "Congress shall make no law . . . abridging the freedom of speech." This Court has determined that political parties—as well as candidates, private individuals, and outside groups—may make unlimited *independent* expenditures during political campaigns. See *Buckley* v. *Valeo*, 424 U. S. 1, 39–59 (*per curiam*). This case concerns FECA's limits on spending by political

parties *in coordination with candidates.*  Pp. 6–21.

(1) FECA limits political-party coordinated expenditures.  FECA's limits impair the party's traditional forms of communication such as advertisements; preclude parties from amplifying the voice of their adherents; impose additional monetary costs and burdens on political parties; and inflict a "stifling effect on the ability of the party to do what it exists to do."  *Colorado Republican Federal Campaign Comm.* v. *Federal Election Comm'n*, 518 U. S. 604, 630 (opinion of Kennedy, J.).  Pp. 7–8.

(2) Statutory limits on contributions to candidates or parties are subject to "closely drawn" scrutiny.  *McCutcheon* v. *Federal Election Comm'n*, 572 U. S. 185, 197 (plurality opinion).  To satisfy that standard, a regulation may not be "disproportionate" and must be "necessary" and "narrowly tailored" to its asserted goal.  *Id.*, at 199, 218, 220; *Federal Election Comm'n* v. *Ted Cruz for Senate*, 596 U. S. 289, 306.  The Court must assess: (i) the Government's asserted interests in imposing the limits at issue and (ii) the fit between the limits and the Government's asserted interests.  *McCutcheon*, 572 U. S., at 199.; see also *Cruz*, 596 U. S., at 305.  The political-party coordinated-expenditure limits fail to satisfy the closely drawn test.  Pp. 8–10.

(3) To analyze FECA's limits on political-party coordinated expenditures, the Court must first assess the asserted governmental interests justifying those limits.  The Court's precedents recognize only one constitutionally permissible government objective for campaign finance restrictions: "preventing corruption or the appearance of corruption." *McCutcheon*, 572 U. S., at 206–207.  And "Congress may target only a specific type of corruption—'*quid pro quo'* corruption."  *Id.,* at 207.  Particularly relevant here, this Court has recognized the risk of *quid pro quo* corruption or its appearance when a donor's contributions to a political party are earmarked—that is, "are directed, in some manner, to a candidate or officeholder."  *Id.,* at 211 (quotation marks omitted).

Ultimately, the First Amendment question in this case boils down to whether FECA's limits on political-party coordinated expenditures are permissible in order to prevent circumvention of the base limits on contributions to candidates through earmarked contributions to parties. In *Colorado II*, this Court said that they were.  533 U. S., at 462–463. But *Colorado II* applied deferential scrutiny to Congress's political-party coordinated-expenditure limits.  *Id.*, at 463, n. 26, 465.  Since *Colorado II*, however, the Court has emphasized that under the closely drawn test, judicial review must be "rigorous."  *McCutcheon*, 572 U. S., at 197.  Under that more demanding standard, the Court agrees with petitioners that the political-party coordinated-expenditure limits are not proportionate, necessary, and narrowly tailored given the other less-speech-restrictive tools available to the Government to prevent

circumvention—in particular, earmarking and disclosure laws.

With respect to earmarking laws: FECA treats an individual's contributions to a party that are "in any way earmarked or otherwise directed through an intermediary or conduit" to a federal candidate "as contributions from such person to such candidate"—and thus subject to the limits on contributions to candidates. 52 U. S. C. §30116(a)(8). In *McCutcheon,* the Court explained that such earmarking rules constitute a targeted and constitutionally permissible way for the Government to prohibit circumvention of the base limits on contributions to candidates. 572 U. S., at 222–223. As JUSTICE THOMAS has explained: "Vigilant enforcement" of the earmarking rules is a more "precise response" by the Government to any "circumvention concerns." *Colorado II*, 533 U. S., at 481 (dissenting opinion).

With respect to disclosure laws: FECA requires that political parties and candidates publicly disclose both the contributions they receive and their spending on campaign activities, including on coordinated expenditures. §30104(b). As the Court emphasized in *McCutcheon*, disclosure has become a much stronger anti-circumvention tool over time because of "modern technology," especially the Internet. 572 U. S., at 224.

Importantly, it is the combination of the base contribution limits *plus* the earmarking rules *plus* the disclosure requirements together that serve the Government's anti-circumvention interests here—without unduly restricting core political party speech. Given the meaningful prophylactic measures available to combat *quid pro quo* corruption or its appearance, the Court concludes that the political-party coordinated-expenditure limits at issue here are "disproportionate" and are not "necessary" and "narrowly tailored" for the circumvention interest. *Id.,* at 199, 218, 220 (quotation marks omitted); *Cruz*, 596 U. S., at 306. Pp. 10–21.

(c) *Amicus* and intervenors contend that the Court should adhere to *Colorado II* as a matter of *stare decisis*, but *Colorado II*'s reasoning has been rejected by the Court's more recent precedents and is no longer good law. To the extent that *Colorado II* has retained any vitality, it is now overruled. Pp. 21–26.

117 F. 4th 389, reversed and remanded.

KAVANAUGH, J., delivered the opinion of the Court, in which ROBERTS, C. J., and THOMAS, ALITO, GORSUCH, and BARRETT, JJ., joined. KAGAN, J., filed a dissenting opinion, in which SOTOMAYOR and JACKSON, JJ., joined.

NOTICE: This opinion is subject to formal revision before publication in the
United States Reports. Readers are requested to notify the Reporter of
Decisions, Supreme Court of the United States, Washington, D. C. 20543,
pio@supremecourt.gov, of any typographical or other formal errors.

# SUPREME COURT OF THE UNITED STATES

───────────

No. 24–621

───────────

## NATIONAL REPUBLICAN SENATORIAL COMMITTEE, ET AL., PETITIONERS *v.* FEDERAL ELECTION COMMISSION, ET AL.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE SIXTH CIRCUIT

[June 30, 2026]

JUSTICE KAVANAUGH delivered the opinion of the Court.

Ratified in 1791, the First Amendment provides that
"Congress shall make no law . . . abridging the freedom of
speech."  As relevant here, the Federal Election Campaign
Act, known as FECA, limits a political party's campaign
spending.  Those spending limits necessarily abridge
political parties' freedom of speech:  Because "virtually
every means of communicating ideas in today's mass society
requires the expenditure of money," a "restriction on the
amount of money a person or group can spend on political
communication during a campaign necessarily reduces the
quantity of expression by restricting the number of issues
discussed, the depth of their exploration, and the size of the
audience reached."  *Buckley* v. *Valeo*, 424 U. S. 1, 19 (1976)
(*per curiam*).

Applying the First Amendment, this Court has long ruled
that a political party possesses a right to make unlimited
*independent* expenditures during a campaign—that is,
expenditures without coordinating with a candidate.  See
*Colorado Republican Federal Campaign Comm.* v. *Federal*

*Election Comm'n*, 518 U. S. 604, 613–616, 618 (1996) (*Colorado I*) (controlling opinion of Breyer, J.).

But FECA still limits a political party's *coordinated* expenditures. As the name implies, a political party's coordinated expenditures are the party's expenditures on, for example, advertisements produced or distributed in consultation with a candidate's campaign. The primary current justification for those limits is to prevent circumvention—that is, to prevent a donor from circumventing the statutory limits on contributions to candidates by making a large contribution to a party that the party then uses to support a particular candidate.

Some 25 years ago in a case known as *Colorado II*, this Court—over the dissent of JUSTICE THOMAS for four Justices—upheld FECA's limits on political-party coordinated expenditures. See *Federal Election Comm'n* v. *Colorado Republican Federal Campaign Comm.*, 533 U. S. 431 (2001). But recently, a group of candidates and political committees filed a new lawsuit and argued that *Colorado II* is no longer good law (or should be overruled). They point to: the significant changes in this Court's First Amendment campaign finance jurisprudence since 2001; the enhancements in the other tools available to the Government to prevent circumvention of the contribution limits, especially earmarking and disclosure laws; and the diminished relative power of political parties as compared to outside groups over the last 25 years, which has undermined a key premise of *Colorado II*. See *McCutcheon* v. *Federal Election Comm'n*, 572 U. S. 185 (2014); *Federal Election Comm'n* v. *Ted Cruz for Senate*, 596 U. S. 289 (2022); see also *SpeechNow.org* v. *Federal Election Comm'n*, 599 F. 3d 686 (CADC 2010) (en banc).

In light of the doctrinal and factual changes since 2001, the United States agrees with plaintiffs that *Colorado II* no longer retains vitality. So the Government does not defend the constitutionality of the political-party coordinated-

expenditure limits. We likewise agree with plaintiffs and now hold that FECA's limits on political parties' coordinated expenditures violate the First Amendment.

I

FECA restricts a political party's coordinated expenditures—that is, a political party's spending on campaign activities in coordination with candidates. 52 U. S. C. §30116(d).[1] The current political-party coordinated-expenditure limits vary by State and by office sought. The national committee of a political party may spend from $130,600 to $4,071,800 in coordination with an individual Senate candidate and from $65,300 to $130,600 in coordination with an individual House candidate. 91 Fed. Reg. 10393–10394 (2026). In the most recent Presidential election, the national committee of a political party could spend $32,392,200 in coordination with a Presidential candidate. 89 Fed. Reg. 5536 (2024).[2]

In 2001, this Court upheld the political-party coordinated-expenditure limits as consistent with the First Amendment. Nearly a generation later, in 2022, the National Republican Senatorial Committee, the National Republican Congressional Committee, then-candidate for Senate JD Vance, and then-Representative Steve Chabot

––––––––––

[1] FEC regulations define a coordinated expenditure as money spent "in cooperation, consultation or concert with, or at the request or suggestion of, a candidate." 11 CFR §109.20(a) (2025); see also 52 U. S. C. §30101(17) (defining "independent expenditure" as "an expenditure by a person—(A) expressly advocating the election or defeat of a clearly identified candidate; and (B) that is not made in concert or cooperation with or at the request or suggestion of such candidate").

[2] There are six authorized national party committees for the two major political parties: the Republican National Committee, the Democratic National Committee, the National Republican Senatorial Committee, the Democratic Senatorial Campaign Committee, the National Republican Congressional Committee, and the Democratic Congressional Campaign Committee. See 11 CFR §§110.1(c)(2), 110.2(c)(2), 110.3(b)(2).

sued the Federal Election Commission and its Commissioners. They claimed that the political-party coordinated-expenditure limits violate the First Amendment. Plaintiffs argued that political parties possess a First Amendment right to spend money as they see fit on political advertising and other campaign activities—and to do so in coordination with the parties' candidates.

The en banc U. S. Court of Appeals for the Sixth Circuit rejected plaintiffs' challenge and upheld FECA's political-party coordinated-expenditure limits, applying this Court's 2001 decision in *Federal Election Comm'n* v. *Colorado Republican Federal Campaign Comm.*, 533 U. S. 431, commonly referred to as *Colorado II*. But in a series of insightful opinions, a majority of the judges on the Court of Appeals questioned that precedent in light of more recent First Amendment decisions of this Court—particularly *McCutcheon* v. *Federal Election Comm'n*, 572 U. S. 185 (2014), and *Federal Election Comm'n* v. *Ted Cruz for Senate*, 596 U. S. 289 (2022). See 117 F. 4th 389, 395 (CA6 2024) (en banc) (Sutton, C. J.); *id.,* at 401 (Thapar, J., concurring); *id.,* at 407 (Bush, J., concurring); *id.,* at 447 (Readler, J., dissenting).

This Court granted certiorari to review whether, in the wake of *McCutcheon*, *Cruz*, and other more recent decisions of this Court, the statutory limits on a political party's coordinated expenditures remain consistent with the First Amendment. 606 U. S. 931 (2025). In this Court, the United States agrees with plaintiffs that FECA's limits on political-party coordinated expenditures are no longer constitutional. The Democratic National Committee, the Democratic Senatorial Campaign Committee, and the Democratic Congressional Campaign Committee are intervenors and argue that the limits are still constitutional. In light of the Government's position, the Court appointed Roman Martinez as *amicus curiae* to

defend the judgment of the Sixth Circuit and the constitutionality of the political-party coordinated-expenditure limits. He has ably discharged his responsibilities.

## II

Before addressing the merits, we must ensure our jurisdiction under Article III. At the outset of the litigation, at least one of the plaintiffs—then-candidate for Senate JD Vance—undisputedly had standing to challenge the law's restriction on coordinated expenditures. But *amicus* and intervenors contend that the case is now moot.

*First*, as *amicus* and intervenors see things, the Vice President no longer faces a credible threat of enforcement if his campaign coordinates with a political party that makes coordinated expenditures above the statutory limits. That is because the Executive Branch has concluded that the political-party coordinated-expenditure limits are unconstitutional; as a result, the Federal Election Commission presumably will no longer enforce the limits. Cf. *Susan B. Anthony List* v. *Driehaus*, 573 U. S. 149, 159 (2014).

But FECA also provides for private suits in certain circumstances if the FEC fails to act. 52 U. S. C. §§30109(a)(1), (a)(8)(A), (a)(8)(C). And the threat of private enforcement is sufficiently credible that this dispute "is still very much alive." *Chafin* v. *Chafin*, 568 U. S. 165, 173 (2013).

*Second*, *amicus* and intervenors assert that the case is moot because Vice President Vance is no longer a candidate for office. Although then-Senator Vance may once have planned to run as a candidate for re-election to the Senate in 2028, *amicus* and intervenors say that the now-Vice President has no "concrete and definite plans to run for any specific federal office" in the future, so FECA's political-

party coordinated-expenditure limits will not apply to him. Brief for Court-Appointed *Amicus Curiae* 13.

The Court need not speculate about Vice President Vance's future runs for office, however, because the Vice President still maintains an active "Statement of Candidacy" on file with the FEC indicating his intent to run for Senate in 2028, as well as a principal campaign committee (JD Vance for Senate) that has raised money for a Senate race. The statement of candidacy and the extant campaign committee cannot be ignored for justiciability purposes, and they establish that the case is not moot.

We therefore turn to the First Amendment issue.

### III

We begin with First Amendment fundamentals. The text of the First Amendment provides that "Congress shall make no law . . . abridging the freedom of speech." The First Amendment embodies "a profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open." *Colorado Republican Federal Campaign Comm.* v. *Federal Election Comm'n*, 518 U. S. 604, 629 (1996) (*Colorado I*) (Kennedy, J., concurring in judgment and dissenting in part) (quotation marks omitted).

The First Amendment's protection of free speech has its "fullest and most urgent application precisely to the conduct of campaigns for political office." *Federal Election Comm'n* v. *Ted Cruz for Senate*, 596 U. S. 289, 302 (2022) (quotation marks omitted). With respect to campaign-related spending, the "central holding in *Buckley* v. *Valeo* is that spending money on one's own speech must be permitted." *Colorado I*, 518 U. S., at 627 (opinion of Kennedy, J.) (citation omitted). For that reason, this Court has determined that political parties—as well as candidates, private individuals, and outside groups—may make unlimited *independent* expenditures during political

campaigns. See *Buckley* v. *Valeo*, 424 U. S. 1, 39–59 (1976) (*per curiam*); *Colorado I*, 518 U. S., at 616 (opinion of Breyer, J.).

The question here concerns FECA's limits on spending by political parties *in coordination with candidates*. For example, a political party may spend money to produce and place a television advertisement in support of a candidate after consulting with the candidate's campaign about the content, timing, or placement of the advertisement.

## A

In tension with the text of the First Amendment, FECA limits political-party coordinated expenditures and thus restricts political parties' speech in support of their own candidates during political campaigns. To understand the severity of the First Amendment problem caused by that restriction, one must first appreciate the important and traditional role of political parties during campaigns.

Political parties articulate policy positions and platforms; select candidates through a primary or caucus process; and then support the election of those candidates in general election campaigns. Because a political party's "success or failure depends in large part on whether its candidates get elected," it is "natural for a party and its candidate to work together and consult with one another during the course of the election." *Federal Election Comm'n* v. *Colorado Republican Federal Campaign Comm.*, 533 U. S. 431, 469 (2001) (*Colorado II*) (THOMAS, J., dissenting). Indeed, as Justice Kennedy described, it "would be impractical and imprudent, to say the least, for a party to support its own candidates without some form of 'cooperation' or 'consultation.'" *Colorado I*, 518 U. S., at 630. After all, "candidates are necessary to make the party's message known and effective, and vice versa." *Id*., at 629.

In a campaign, the coordination between party and candidate may encompass the what, when, where, how, and

to whom of political activities and communications. What policy positions should the party and candidate adopt and emphasize? When and where should the party and candidate run campaign ads? What is the best content for party ads? For candidate ads? For candidate and surrogate speeches? Which voters should the party and candidate target? How best to use social media? How can the party and candidate avoid duplication of effort? How can the party and candidate best get out the vote? The list goes on.

In light of those day-to-day activities, parties and candidates have traditionally coordinated during campaigns. That coordination has formed "the essence of our Nation's party system of government." *Colorado II*, 533 U. S., at 477 (THOMAS, J., dissenting). For nearly 200 years after the ratification of the First Amendment, parties could spend freely to support their candidates during campaigns and could do so in coordination with the candidates. Notably, no one suggests "that these elections were not functional or that they were marred by corruption." *Id.*, at 473 (quotation marks and citation omitted).

But the modern congressional limits on political-party coordinated expenditures restrict that coordination and the party's speech. The limits impair the party's traditional forms of communication such as advertisements; preclude parties from amplifying the voice of their adherents; impose additional monetary costs and burdens on political parties; and inflict a "stifling effect on the ability of the party to do what it exists to do." *Colorado I*, 518 U. S., at 630 (opinion of Kennedy, J.); see also *Colorado II*, 533 U. S., at 469–471 (THOMAS, J., dissenting).

B

As a matter of text and history, therefore, the restriction on political-party coordinated expenditures would appear to violate the First Amendment. But the Court's precedents—

particularly *Colorado II* in 2001—cloud the issue and require additional and more nuanced analysis.

This Court's precedents start with the basic precept that when "the Government restricts speech, the Government bears the burden of proving the constitutionality of its actions." *McCutcheon* v. *Federal Election Comm'n*, 572 U. S. 185, 210 (2014) (plurality opinion) (quotation marks omitted).[3]  Restrictions on campaign *expenditures* for political speech are permitted only in the exceedingly rare circumstances where they promote a compelling interest and are the "least restrictive means to further the articulated interest." *Id.*, at 197.

The Court has held that statutory limits on *contributions* to candidates or parties—as distinct from limits on expenditures—are subject to "closely drawn" scrutiny, a nominally "lesser but still rigorous standard of review." *Ibid.* (quotation marks omitted).  The Government must demonstrate "a sufficiently important interest" and employ means "closely drawn" to that interest. *Ibid.* (quotation marks omitted).

In recent cases such as *McCutcheon* and *Cruz*, the Court has stressed that, in order to satisfy closely drawn scrutiny, a regulation may not be "disproportionate" and must be "necessary" and "narrowly tailored" to its asserted goal. *McCutcheon*, 572 U. S., at 199 (law must avoid "unnecessary" abridgment of speech to survive "rigorous" review (quotation marks omitted)); *id.*, at 218 (law must be "narrowly tailored" to meet the objective (quotation marks omitted)); *id.*, at 220 (law cannot be "disproportionate to the Government's interest"); *Cruz*, 596 U. S., at 306 (law must be "necessary for the interest it seeks to protect").

_____

[3] In *McCutcheon*, THE CHIEF JUSTICE wrote the controlling opinion for four Justices. See *Marks* v. *United States*, 430 U. S. 188, 193 (1977). JUSTICE THOMAS concurred in the judgment on broader grounds.

But the question of which test to apply here is ultimately academic. Regardless of "whether we apply strict scrutiny or *Buckley*'s 'closely drawn' test, we must assess" (i) the Government's asserted interests in imposing the limits at issue and (ii) the fit between the limits and the Government's asserted interests. *McCutcheon*, 572 U. S., at 199; see also *Cruz*, 596 U. S., at 305. And because, as we will explain, the political-party coordinated-expenditure limits fail to satisfy even the closely drawn test, we need not dwell on any subtle differences between the two tests.

C

To analyze FECA's limits on political-party coordinated expenditures, we must assess the asserted governmental interests for that infringement on the freedom of speech of political parties.

Four potential governmental interests have been identified to justify the political-party coordinated-expenditure limits. We will address each in turn.

*First*, in 1974, Congress enacted the political-party coordinated-expenditure limits for the "purpose of reducing what it saw as wasteful and excessive campaign spending." *Colorado I*, 518 U. S., at 618 (opinion of Breyer, J.). But we need not linger on that governmental interest because no one actually invokes or defends it here. Nor could they. Such an interest is a flatly impermissible basis for restricting speech. This Court has consistently held that Congress may not restrict campaign-related spending simply to "reduce the amount of money in politics." *Cruz*, 596 U. S., at 305; see also *Buckley*, 424 U. S., at 57. Congress may not dictate how much political speech is too much or how much spending on speech is too much. Nor may Congress restrict campaign spending so as to level the electoral playing field, or to enhance or diminish the relative influence of certain groups or views. *Cruz*, 596 U. S., at 305. The "concept that government may restrict

the speech of some elements of our society in order to enhance the relative voice of others is wholly foreign to the First Amendment." *Buckley*, 424 U. S., at 48–49.

In short, Congress's original justification for the limits on political-party coordinated expenditures is entirely inadequate under the First Amendment. Cf. *Kennedy* v. *Bremerton School Dist.*, 597 U. S. 507, 543, n. 8 (2022) ("Government justifications for interfering with First Amendment rights" must not be "hypothesized or invented *post hoc* in response to litigation" (quotation marks and alterations omitted)).

*Second*, some might suggest that the Government possesses an interest in preventing a *political party* (as distinct from donors) from exercising undue influence on its candidates. But *amicus* and intervenors do not try to justify the political-party coordinated-expenditure limits on that basis. For good reason. Such a theory does not "make any sense" given the thoroughly intertwined relationship of parties and their candidates. 117 F. 4th 389, 402 (CA6 2024) (en banc) (Thapar, J., concurring). As JUSTICE THOMAS has succinctly explained, any influence a political party exerts over its candidates and officials "is not corruption"—it is "successful advocacy of ideas in the political marketplace and representative government in a party system." *Colorado I*, 518 U. S., at 646 (opinion concurring in judgment and dissenting in part).

*Third*, in 2001 in *Colorado II*, the Court justified the political-party coordinated-expenditure limits in part on a new donor-centric theory—namely, that the limits curb a donor's "undue influence on an officeholder's judgment, and the appearance of such influence." 533 U. S., at 441; see also *McCutcheon*, 572 U. S., at 240 (Breyer, J., dissenting) (noting that *Colorado II* upheld the limits as a means of preventing "undue influence by wealthy donors" (quotation marks omitted)).

But in subsequent cases, particularly *McCutcheon* and *Cruz*, this Court has squarely rejected undue influence as a permissible basis for the Government to regulate campaign finances and limit political speech. In those more recent cases, the Court has spoken clearly and definitively: Congress may not restrict spending because of "the possibility that" political parties, individuals, or outside groups that spend "large sums may garner influence over or access to elected officials." *McCutcheon*, 572 U. S., at 208 (quotation marks omitted). Nor may they do so "to limit the appearance of mere influence or access." *Ibid.* Speech regulations may not target "general gratitude." *Id.*, at 192. The Court has reasoned that "[i]ngratiation and access . . . are not corruption," but instead "embody a central feature of democracy—that constituents support candidates who share their beliefs and interests, and candidates who are elected can be expected to be responsive to those concerns." *Ibid.* (quotation marks omitted).

The Court now recognizes "only one legitimate governmental interest for restricting campaign finances: preventing corruption or the appearance of corruption." *Id.*, at 206–207. Moreover, "Congress may target only a specific type of corruption—'*quid pro quo*' corruption." *Id.,* at 207. And *quid pro quo* corruption in turn is something specific—contributions in exchange for official action. "That Latin phrase captures the notion of a direct exchange of an official act for money. The hallmark of corruption is the financial *quid pro quo*: dollars for political favors." *Id.*, at 192 (quotation marks and citation omitted).

Although the "line between *quid pro quo* corruption and general influence may seem vague at times," "the distinction must be respected in order to safeguard basic First Amendment rights." *Id.*, at 209. In drawing that distinction, "the First Amendment requires us to err on the side of protecting political speech rather than suppressing it." *Ibid.* (quotation marks omitted).

In short, under the Court's more recent First Amendment precedents, the Government's desire to prevent or reduce influence, ingratiation, gratitude, access, or the like for those who spend in support of, or contribute to, political parties or candidates is not a constitutionally permissible objective for campaign finance restrictions. Therefore, the political-party coordinated-expenditure limits can no longer be justified on that basis.

*Fourth*, the *Colorado II* decision also rested on an anti-circumvention rationale. The anti-circumvention theory goes like this: An individual donor who wants to engage in *quid pro quo* corruption—that is, donate to a candidate in exchange for official action by that candidate when in office—might give a candidate's political party large contributions above the existing limits on contributions to candidates. And the party might then spend that money in coordination with the candidate in order to support that candidate's campaign.

*Colorado II* concluded that the political-party coordinated-expenditure limits help prevent such circumvention of the contribution limits. 533 U. S., at 457.

But this Court has since retreated from that rationale. As the Court later emphasized in *McCutcheon*, that kind of purported circumvention is one significant step removed from actual *quid pro quo* corruption—that is, from a donor's contribution *to a candidate* in exchange for official action.

That is because the donor gives money to a political party, not to the candidate. That distinction is significant: *McCutcheon* recognized that there "is not the same risk of *quid pro quo* corruption . . . when money flows through independent actors to a candidate, as when a donor contributes to a candidate directly." 572 U. S., at 210. After the donor has contributed to the party, the party is legally and practically free to use the funds as it sees fit— presumably supporting the candidates who have the best chance of success, are locked in the closest races, or align

the most with the party, among other possibilities. The party need not spend the money on the candidate of the donor's choice.

It is of course true that parties and their candidates often work closely together, as detailed above. That is the nature of political parties and campaigns. But their interests are not identical. The party's interests are broader and more dispersed. Often, the party will simultaneously focus on numerous candidates, policy proposals, ballot initiatives, get-out-the-vote activities, advertising efforts, and the like—not simply the campaign of one candidate. If the donor's contributions to a political party are "subsequently rerouted to a particular candidate, such action occurs at the initial recipient's discretion"—namely, the political party's, "not the donor's." *Id.*, at 211. "As a consequence, the chain of attribution grows longer, and any credit must be shared among the various actors along the way." *Ibid.*

*Amicus* and intervenors respond that the political-party coordinated-expenditure limits remain necessary to prevent circumvention because a donor might specifically direct or require the party to use the donor's monetary contribution to the party in order to support a particular candidate—a practice referred to as "earmarking."

That is a serious argument. This Court has recognized the risk of *quid pro quo* corruption or its appearance when a donor's contributions are earmarked—that is, "are directed, in some manner, to a candidate or officeholder." *Ibid.* (quotation marks omitted). Indeed, plaintiffs do not dispute that the Government possesses a constitutionally sufficient interest in restricting earmarking of funds over the contribution limits. Brief for Petitioners 21–24; Tr. of Oral Arg. 37.

So the First Amendment question in this case ultimately boils down to: Whether FECA's limits on political-party coordinated expenditures are permissible in order to prevent circumvention of the base limits on contributions to

candidates via large contributions to parties that are earmarked (*i.e.*, directed) to a candidate?

In *Colorado II*, this Court said that the limits were permissible. 533 U. S., at 462–465. Plaintiffs counter that there have been substantial changes since 2001 in the Court's First Amendment jurisprudence and in the other less-speech-restrictive tools available to the Government to prevent circumvention via earmarking, including earmarking and disclosure laws. And in light of those developments, plaintiffs say that the political-party coordinated-expenditure limits are now unconstitutional.

To begin, *Colorado II* applied deferential scrutiny to Congress's political-party coordinated-expenditure limits as a means to prevent circumvention. The Court's opinion made no mention of "narrow tailoring" and never suggested that the restriction must be considered "necessary" and not "disproportionate" for the anti-circumvention interest. On the contrary, the Court stated, for example, that Congress was "entitled to its choice" among alternatives and that the Court would not "throw out" the limits for "unskillful tailoring." *Id.*, at 463, n. 26, 465.

Since *Colorado II*, the Court has sung a much different tune. The Court has emphasized that, even under the closely drawn test, judicial review must be "rigorous." Restrictions on campaign finance cannot be "disproportionate" and must be "necessary" and "narrowly tailored" to serve the Government's asserted interest. *McCutcheon*, 572 U. S., at 199 (law must avoid "unnecessary" abridgment of speech to survive "rigorous" review (quotation marks omitted)); *id.*, at 218 (law must be "narrowly tailored" to meet the objective (quotation marks omitted)); *id.*, at 220 (law cannot be "disproportionate to the Government's interest"); *Cruz*, 596 U. S., at 306 (law must be "necessary for the interest it seeks to protect").

Under those more demanding standards, plaintiffs say that the political-party coordinated-expenditure limits are

not proportionate, necessary, and narrowly tailored given the other less-speech-restrictive tools available to the Government to prevent circumvention—in particular, earmarking and disclosure laws.

We therefore need to dig more deeply into the specifics of earmarking and disclosure laws.

With respect to earmarking laws:  FECA treats an individual's contributions to a party that are "in any way earmarked or otherwise directed through an intermediary or conduit" to a federal candidate "as contributions from such person to such candidate"—and thus subject to the limits on contributions to candidates.  52 U. S. C. §30116(a)(8).  By regulation, the FEC defines earmarking as any "designation, instruction, or encumbrance" directing funds to support a candidate.  11 CFR §110.6(b)(1) (2025).

In *McCutcheon,* the Court explained that such earmarking rules constitute a targeted and constitutionally permissible way for the Government to prohibit circumvention of the base limits on contributions to candidates.  572 U. S., at 222–223.  Indeed, it is difficult to conjure up realistic scenarios where a donor could circumvent the base limits on contributions to candidates via earmarking in a way that does not also violate those earmarking regulations.  See *id.*, at 223.[4]

With respect to disclosure laws:  FECA requires that political parties and candidates publicly disclose both the contributions they receive and their spending on campaign activities, including on coordinated expenditures. §30104(b).  As the Court emphasized in *McCutcheon*, disclosure has become a much stronger anti-circumvention tool over time because "modern technology" provides a "particularly effective means of arming the voting public with information."  *Id.*, at 224.  "Today, given the Internet,

_____

[4] Also, the federal criminal bribery laws directly prohibit *quid pro quo* exchanges of contributions for official action.  *E.g.*, 18 U. S. C. §201.

disclosure offers much more robust protections against corruption" than it once did. *Ibid.* "Because massive quantities of information can be accessed at the click of a mouse, disclosure is effective to a degree not possible" when the Court decided earlier cases—including *Colorado II.* 572 U. S., at 224. Indeed, *McCutcheon*'s observations on that point are even more true today than they were in 2014 given continued technological advances.

That transparency matters both factually and legally. Factually, as the Court has explained, disclosure can "deter actual corruption and avoid the appearance of corruption by exposing large contributions and expenditures to the light of publicity." *Id.*, at 223 (quotation marks omitted). Disclosure can help trigger investigations of whether a donor and party have violated earmarking laws. Legally, the Court in *McCutcheon* stressed that "disclosure often represents a less restrictive alternative to flat bans on certain types or quantities of speech." *Ibid.*

To all of that, *amicus* and intervenors retort that the earmarking and disclosure rules, while useful, are not adequate to prevent circumvention of the base contribution limits. But especially given the significant First Amendment rights at stake here, those counterarguments are ultimately unpersuasive.

As for earmarking rules, *amicus* and intervenors contend that they leave a gap "where a donor simply expects that his donation will go to a particular candidate, without actively directing his funds." Brief for Court-Appointed *Amicus Curiae* 43. But under this Court's current precedents, a mere expectation or hope does not itself equate to circumvention or rise to the level of *quid pro quo* corruption or its appearance, especially given a donor's lack of control over the funds once contributed to the party. *McCutcheon*, 572 U. S., at 210–211. The possibility that a political party *might* act in accordance with a contributor's expectations or hopes—or is even likely to do so—is not

enough to override the First Amendment and justify limits on political party speech.

*Amicus* and intervenors also assert that the earmarking rules are often toothless because "violations are essentially impossible to discover and prove." Brief for Court-Appointed *Amicus Curiae* 44. But there is no good reason to think that the Government cannot detect a donor who tries to make a disguised large contribution to a particular candidate by funneling it through a contribution to a party. See Reply Brief for Federal Respondents 18–19. Especially given the companion disclosure requirements, those kinds of contributions will be easy enough for the Government to identify and, if warranted, investigate as possible earmarks.

Moreover, to the extent that *amicus* and intervenors are suggesting that earmarking rules go unenforced or under-enforced, that problem primarily is one of sufficient investigative resources and enforcement priorities by the Executive Branch. But a purported lack of Government (Executive) enforcement of campaign finance restrictions is not an excuse for the Government (Congress and the Executive) to turn around and enact legislation that would broadly suppress speech and sweep aside the First Amendment. As JUSTICE THOMAS explained: "Vigilant enforcement" of the earmarking rules is a more "precise response" by the Government to any "circumvention concerns." *Colorado II*, 533 U. S., at 481 (dissenting opinion).

For those reasons, *McCutcheon* relied on the earmarking rule in explaining why the aggregate contribution limits at issue there were unnecessary to prevent circumvention. 572 U. S., at 201–202, 210–212, 215, 222–223. So too here.

With regard to the disclosure rules, *amicus* and intervenors question whether they are a sufficient substitute for political-party coordinated-expenditure limits. But as *McCutcheon* outlined, modern technology

has evolved such that "disclosure now offers a particularly effective means of arming the voting public with information." *Id.*, at 224.

Importantly, disclosure does not stand on its own. Rather, the combination of the base contribution limits *plus* the earmarking rules *plus* the disclosure requirements together serve the Government's anti-circumvention interests here—without unduly restricting core political party speech.

In response to *amicus*'s and intervenors' arguments that the combination—namely, the base limits on contributions to candidates, the earmarking rules, and disclosure requirements—is still not adequate to prevent circumvention, the current record in the States does not demonstrate a sufficient risk of *quid pro quo* corruption from political-party coordinated expenditures. In the campaign finance context, this Court has often looked to the experience of the States. *Id.*, at 209–210, n. 7; *Cruz*, 596 U. S., at 307. When States do not impose a particular campaign-finance restriction, the absence of evidence of resulting *quid pro quo* corruption is a strong sign that the concern is too speculative to support such a restriction at the federal level. On that issue, as Chief Judge Sutton recounted in the Sixth Circuit, a majority of the States "largely give parties free rein to make coordinated expenditures on behalf of their state-level nominees." 117 F. 4th, at 396 (quotation marks omitted). Yet "no evidence of corruption" via circumvention "has materialized." *Ibid.*

That record in the States weakens any claim that federal political-party coordinated-expenditure limits are a proportionate, necessary, and narrowly tailored means for addressing circumvention. In a case involving attempted restrictions on speech, the absence of evidence matters. See *Cruz*, 596 U. S., at 307. Speculation does not suffice to justify suppression of political speech: The Court has "never accepted mere conjecture as adequate to carry a

First Amendment burden." *McCutcheon*, 572 U. S., at 210 (quotation marks omitted).

The base limits on contributions to candidates serve as an initial prophylaxis against *quid pro quo* corruption or its appearance in this context—after all, most contributions to candidates are not given in exchange for some official action. *Id.*, at 221. The earmarking rules constitute a second prophylaxis. The disclosure requirements supply a third prophylaxis. So prophylaxis upon prophylaxis upon prophylaxis already serve to prevent *quid pro quo* corruption or its appearance.

The political-party coordinated-expenditure limits at issue here would operate as a fourth line of defense. Such a "prophylaxis-upon-prophylaxis approach requires that we be particularly diligent in scrutinizing the law's fit." *Ibid.* (quotation marks omitted). But the fourth prophylaxis imposes a severe and direct restriction on free speech and infringes fundamental First Amendment values. Otherwise stated, the restriction on political-party coordinated expenditures is "disproportionate" and is not "necessary" and "narrowly tailored" to the Government's interest in preventing circumvention of the base contribution limits. *Id.*, at 199, 218, 220 (quotation marks omitted); *Cruz*, 596 U. S., at 306.

On that last point, it is worth briefly focusing on the term "disproportionate" from *McCutcheon*. In this campaign finance context, determining how much regulation is enough to serve the Government's asserted interest is not a scientific exercise. But in light of the First Amendment free-speech rights at stake, courts must be particularly vigilant. Courts cannot simply say, "what's the harm in allowing just one more regulation" when that regulation would limit freedom of speech. On the contrary, courts must preserve and protect the freedom of speech guaranteed by the Framers. Necessary, narrowly tailored, and disproportionate may be technical legal terms, but they

help ensure that courts appropriately respect the bedrock First Amendment principles at stake.

To sum up: In light of the other meaningful prophylactic measures available to the Government, and given the severe infringement on First Amendment-protected political speech that ensues from limiting a political party's spending in support of its candidates, we conclude that the political-party coordinated-expenditure limits are "disproportionate" and are not "necessary" and "narrowly tailored" for the circumvention interest it seeks to protect. *McCutcheon*, 572 U. S., at 199, 218, 220 (quotation marks omitted); *Cruz*, 596 U. S., at 306.[5]

## IV

Notwithstanding all of the above, *amicus* and intervenors contend that we should adhere to *Colorado II* as a matter of *stare decisis*.

*Colorado II*, however, is akin to a three-legged stool where all three legs have already been knocked out—here, by post-*Colorado II* cases. In like circumstances, the Court sometimes has simply described similarly hollowed-out

---

[5] In 2014, Congress amended the political-party coordinated-expenditure limits to exempt certain categories of political-party spending. Consolidated and Further Continuing Appropriations Act, 2015, 128 Stat. 2772–2773. The law now imposes no limit on the amount that a political party may spend in coordination with candidates on election recounts, post-election-day contests, and other election-related legal proceedings. 52 U. S. C. §§30116(a)(9), (d)(5). And the law raised to $20 million the limit on how much a party may spend in coordination with its candidates on a Presidential nominating convention. *Ibid.*

We need not and do not rely on those statutory changes as a basis for our decision today, but those carveouts further illustrate that Congress is not pursuing an anti-corruption or anti-circumvention rationale with the current political-party coordinated-expenditure limits. It is hard to understand how corruption concerns could justify limits on spending on candidate advertising while allowing spending on a candidate's legal fees. After all, to a candidate, there is no particular difference between coordinated spending on messaging or coordinated spending on lawyers.

precedents as "so undermined" by subsequent developments that they are "no longer good law" and "retai[n] no vitality." *Agostini* v. *Felton*, 521 U. S. 203, 217–218 (1997); *Herrera* v. *Wyoming*, 587 U. S. 329, 342 (2019) (quotation marks omitted); see also *Kennedy* v. *Bremerton School Dist.*, 597 U. S. 507, 534 (2022) (recognizing that "this Court long ago abandoned" a precedent and treating it as already overruled). The Court has not hesitated to reject adherence to a "doctrinal dinosaur or legal last-man-standing." *Kimble* v. *Marvel Entertainment, LLC*, 576 U. S. 446, 458 (2015). That description is apt for *Colorado II*.

Nonetheless, we will proceed to apply the ordinary *stare decisis* factors.

The Court has often stated that *stare decisis* promotes the "evenhanded, predictable, and consistent development of legal principles, fosters reliance on judicial decisions, and contributes to the actual and perceived integrity of the judicial process." *Payne* v. *Tennessee*, 501 U. S. 808, 827 (1991). But *stare decisis* is not an "inexorable command." *Ramos* v. *Louisiana*, 590 U. S. 83, 105 (2020) (quotation marks omitted). And it is "at its weakest when we interpret the Constitution." *Ibid.* (quotation marks omitted). As Justice Brandeis wrote and remains true: In "cases involving the Federal Constitution, where correction through legislative action is practically impossible, this Court has often overruled its earlier decisions." *Burnet* v. *Coronado Oil & Gas Co.*, 285 U. S. 393, 406–407 (1932) (dissenting opinion).

When conducting the *stare decisis* inquiry, the Court has sometimes broadly phrased the issue as whether a "special justification" for overruling exists. See *Ramos*, 590 U. S., at 120, n. 3 (KAVANAUGH, J., concurring in part). The Court decides whether to overrule a constitutional precedent by considering the egregiousness of the precedent's error, the jurisprudential and real-world effects of the decision, and any cognizable reliance interests. *Id.*, at 105–106 (opinion

of the Court); *id.*, at 120–123 (opinion of KAVANAUGH, J.). A prior decision may have been "egregiously wrong when decided" or "may be unmasked as egregiously wrong based on later legal or factual understandings or developments." *Id.*, at 122.

Starting here with the asserted egregiousness of the error: In *Colorado II*, JUSTICE THOMAS dissented, joined by Chief Justice Rehnquist, Justice Scalia, and Justice Kennedy. He explained that "the ordinary means for a party to provide support is to make coordinated expenditures." *Federal Election Comm'n* v. *Colorado Republican Federal Campaign Comm.*, 533 U. S. 431, 469 (2001). He added "that parties and candidates have shared interests, that it is natural for them to work together, and that breaking the connection between parties and their candidates inhibits the promotion of the party's message." *Id.*, at 473. JUSTICE THOMAS further noted that the Court had "never upheld an expenditure limitation against political parties." *Id.*, at 475. And critically, he reasoned that there "are better tailored alternatives for addressing" the Government's interests, including earmarking rules that prohibit contributions to parties that are earmarked to support particular candidates. *Id.*, at 481. "Instead of broadly restricting political parties' speech, the Government should have pursued better-tailored alternatives for combating the alleged corruption." *Id.*, at 482.

JUSTICE THOMAS's *Colorado II* dissent was persuasive in 2001 and has since been amply vindicated by this Court's subsequent precedents. To briefly reiterate some of those post-2001 developments:

The Court no longer employs *Colorado II*'s watered-down scrutiny that allowed "unskillful tailoring" in the First Amendment campaign-finance context. 533 U. S., at 463, n. 26. The Court now applies a stricter form of scrutiny: A statutory restriction may not be "disproportionate" and

must be "necessary" and "narrowly tailored" to the asserted interest.  See *McCutcheon* v. *Federal Election Comm'n*, 572 U. S. 185, 199, 218, 220 (2014) (quotation marks omitted); *Federal Election Comm'n* v. *Ted Cruz for Senate,* 596 U. S. 289, 306 (2022).

The Court, moreover, has repudiated the undue influence rationale relied on in *Colorado II.*  See *McCutcheon*, 572 U. S., at 207–208.  And after *Colorado II*, this Court has identified earmarking and disclosure laws as sufficient to prevent circumvention.  See 572 U. S., at 221–224.

Still further, *Colorado II*'s description of the relationship between political parties and candidates has not held up. *Colorado II* stated that parties are not "in a unique position" to candidates.  533 U. S., at 455.  But as the Court subsequently recognized, only parties "select slates of candidates," and "party affiliation is the primary way by which voters identify candidates." *McConnell* v. *Federal Election Comm'n,* 540 U. S. 93, 188 (2003).  Political parties therefore do occupy a unique position with "a special relationship and unity of interest" with candidates.  *Id.*, at 145.

Turning to the effects of *Colorado II*:  That decision rested in part on an apparent concern that political parties otherwise could exercise outsized influence in political campaigns and elections—in particular that parties "act as agents for spending on behalf of those who seek to produce obligated officeholders."  533 U. S., at 452.  *Colorado II* opined that "parties' capacity to concentrate power to elect is the very capacity that apparently opens them to exploitation as channels for circumventing contribution and coordinated spending limits binding on other political players." *Id.*, at 455.

But since 2001, political parties' relative power has substantially diminished in comparison to outside groups. *Colorado II* contributed in part to that shift:  The political-party coordinated-expenditure limits impose a "stifling

effect on the ability of the party to do what it exists to do." *Colorado Republican Federal Campaign Comm.* v. *Federal Election Comm'n*, 518 U. S. 604, 630 (1996) (*Colorado I*) (opinion of Kennedy, J.); see R. Pildes, Romanticizing Democracy, Political Fragmentation, and the Decline of American Government, 124 Yale L. J. 804, 838–839 (2014). Meanwhile, donors can and do send their funds to Super PACs and other outside groups that have a First Amendment right to receive and spend unlimited money to support their independent political speech. See *SpeechNow.org* v. *Federal Election Comm'n*, 599 F. 3d 686 (CADC 2010) (en banc); see also *Emily's List* v. *Federal Election Comm'n*, 581 F. 3d 1 (CADC 2009). In the 2024 election cycle, PACs raised over $15.7 billion, as compared to $2.7 billion by political parties. Federal Election Comm'n, Statistical Summary of 24-Month Campaign Activity of the 2023–2024 Election Cycle Press Release (Apr. 23, 2025).

To uphold the political-party coordinated-expenditure limits here could therefore help consign political parties to continued second-tier status as compared to outside groups. Weakened political parties distort the political system. And in the views of many, the relatively diminished political parties have ushered in increased political polarization and fragmentation. For that reason, many who generally support campaign finance restrictions have called for elimination of the political-party coordinated-expenditure limits. See R. Pildes & B. Bauer, Election Law Blog: The Supreme Court, the Political Parties, and the SuperPacs (June 24, 2025) ("[E]ven many in the political reform community support an end to the limits" on political-party coordinated expenditures).

Finally as to reliance: The reliance of outside groups on a precedent that has helped them gain an unwarranted and unfair advantage over competitor political parties in the political process is not the kind of reliance interest that

commands adherence to an egregiously wrong precedent. More speech is generally better than less speech.

The bottom line: *Colorado II*'s reasoning has been rejected by subsequent cases and is no longer good law in light of the Court's more recent precedents. To the extent that *Colorado II* has retained any vitality, it is now overruled.[6]

V

In response to the thoughtful dissent, two main points:

First, debates over the First Amendment and campaign finance have arisen often over the last 50 years. We recognize that at least two of the dissenters have not agreed with some of the Court's decisions in that area. See, *e.g.*, *Federal Election Comm'n* v. *Ted Cruz for Senate*, 596 U. S. 289, 314 (2022) (KAGAN, J., dissenting); *McCutcheon* v. *Federal Election Comm'n*, 572 U. S. 185, 232 (2014) (Breyer, J., dissenting); *Citizens United* v. *Federal Election Comm'n*, 558 U. S. 310, 393 (2010) (Stevens, J., concurring in part and dissenting in part). Today, we have endeavored to follow the principles laid down in the Court's decisions. In doing so, moreover, we have concluded that *Colorado II* is (in our view) an outlier that is not consistent with those precedents. See 533 U. S. 431 (2001).

The dissent focuses, in particular, on the operations of joint fundraising committees—the apparent concern being that a donor could write a large check to a joint committee that would then be funneled to the candidate. See *post*, at 7–12, 15–18 (opinion of KAGAN, J.). But *McCutcheon* rejected a similar circumvention argument, and its

---

[6] To be clear, the Court's decision does not address the statutory limits on coordinated expenditures by outside groups. As the Government explained at oral argument, political parties possess an especially strong First Amendment interest in working together with their candidates and making expenditures on political speech in coordination with their candidates. See Tr. of Oral Arg. 65–66.

reasoning applies here as well. In *McCutcheon*, the Court explained that "a joint fundraising committee is simply a mechanism for individual committees to raise funds collectively, not to circumvent base limits or earmarking rules." 572 U. S., at 215. Any agreement between the donor and the committee to direct funds to a particular candidate "would trigger the earmarking provision." *Ibid.* So "this circumvention scenario could not succeed without assuming" that the joint committee "would engage in a transparent violation of the earmarking rules" and that it "would not be caught" if it did. *Ibid.*

Second, although the dissent raises concerns about money in political campaigns and about this Court's First Amendment jurisprudence, the core disagreement between the Court and the dissent is legally quite narrow, albeit practically significant. See *post*, at 5 (opinion of KAGAN, J.) ("Our difference concerns only—though this is no small 'only'—whether the Government's strong interest in preventing circumvention of the base limits also justifies the coordinated-expenditure caps at issue here").

The Court and the dissent agree that the Government possesses an important interest in preventing circumvention of the base contribution limits. The Court concludes, as noted above, that the combination of the statutory base limits, earmarking rules, and disclosure requirements are sufficient to prevent circumvention of the base limits. The dissent believes that, in addition to those three statutory requirements, the statute's coordinated-expenditure limits are also necessary to prevent circumvention. As we stated above, that is a serious argument. But we ultimately and respectfully do not agree with the dissent on that point for the reasons already set forth at length in this opinion.

\*   \*   \*

The intervenors proclaim that the "Framers were famously suspicious of parties." Brief for Intervenor-Respondents 28. But the Framers were even more famously suspicious of government suppression of political speech.

Recall again the words of the First Amendment: "Congress shall make no law . . . abridging the freedom of speech." The Constitution's text matters. Contrary to that text, the political-party coordinated-expenditure limitations directly abridge the freedom of speech of political parties.

History also matters. For nearly 200 years after the ratification of the First Amendment, parties could spend on campaigns in coordination with candidates. Parties and candidates could work cooperatively toward their common goal of advancing policies and winning elections to implement those policies. Again, no one suggests "that these elections were not functional or that they were marred by corruption." *Federal Election Comm'n* v. *Colorado Republican Federal Campaign Comm.*, 533 U. S. 431, 473 (2001) (*Colorado II*) (THOMAS, J., dissenting) (quotation marks and citation omitted).

So too, precedent matters. This Court's more recent decisions in cases such as *McCutcheon* and *Cruz* (as distinct from *Colorado II*) demonstrate that the First Amendment proscribes disproportionate regulations such as FECA's limits on political-party coordinated expenditures. See *McCutcheon* v. *Federal Election Comm'n*, 572 U. S. 185, 218 (2014); *Federal Election Comm'n* v. *Ted Cruz for Senate*, 596 U. S. 289, 306–307 (2022).

In short, constitutional text, history, and precedent establish that the political-party coordinated-expenditure limits violate the First Amendment.

Importantly, by holding FECA's political-party coordinated-expenditure restrictions unconstitutional, the

Court's decision today treats all political parties equally. It will allow all political parties—including the DNC and RNC and the respective Senate and House campaign committees, as well as other parties and party committees—to participate more freely and compete more fully in the political process, and to coordinate more closely with their candidates. Whether the Democratic party, the Republican party, or other parties, all political parties and candidates going forward can compete equally under the same rules regarding coordinated expenditures and can structure their fundraising, spending, and political speech on a level playing field as they see fit within the law.

We reverse the judgment of the U. S. Court of Appeals for the Sixth Circuit and remand the case for further proceedings consistent with this opinion.

*It is so ordered.*

# SUPREME COURT OF THE UNITED STATES

No. 24–621

## NATIONAL REPUBLICAN SENATORIAL COMMITTEE, ET AL., PETITIONERS *v.* FEDERAL ELECTION COMMISSION, ET AL.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE SIXTH CIRCUIT

[June 30, 2026]

JUSTICE KAGAN, with whom JUSTICE SOTOMAYOR and JUSTICE JACKSON join, dissenting.

For over half a century, a federal statute has guarded against actual and apparent *quid pro quo* corruption in our political system by limiting the amount of money a donor can contribute to a candidate. The law's theory is simple: A candidate may be induced to trade official acts for campaign contributions—and the bigger the contribution, the stronger both the candidate's temptation and the public's suspicion.

The same statute also prevents circumvention of the contribution limits by capping political parties' "coordinated expenditures" with candidates. When a party makes such a coordinated expenditure, it essentially pays the candidate's bills—stepping up to fund something the candidate would otherwise have to. Without limits on those expenditures, a candidate could ask a donor to make a substantial contribution to the party so as to finance his own campaign expenses. It would then be as though the candidate contribution limits did not exist: The donor could give far more to the party than to the candidate directly, understanding that the money would be passed through to the candidate. And with that evasion of contribution limits, all the old opportunities for *quid pro quo* deals would come back into

play.  So Congress, sensibly enough, limited parties' coordinated expenditures.  By thus preventing circumvention of the basic contribution limits, Congress protected those limits' capacity to suppress corruption.

But today, the Court rewrites the rules, to allow circumvention of the contribution limits.  The majority invalidates Congress's restriction of coordinated expenditures, thus enabling a party to serve as an alternative checking account for a campaign.  As a result, a donor will be able to give a party as much as half a million dollars (as compared to the $7,000 he can give directly to the candidate) to cover the candidate's bills.  And the candidate can seek just such a donation.  So the Court ushers back in the same opportunities for *quid pro quo* corruption that the contribution limits were meant to check.

Contra the majority, nothing in the First Amendment mandates that outcome—as indeed this Court has held before.  The First Amendment permits campaign finance restrictions that are narrowly tailored to protect against *quid pro quo* corruption and its appearance.  Caps on a party's coordinated expenditures pass that test with flying colors.  The caps prevent easy circumvention of contribution limits; and so the former, as much as the latter, are needed to avert corrupt deals between candidates and their supporters.  That is not my personal theory.  It is (now was) the Court's.  Twenty-five years ago, in a case called *Colorado II*, the Court considered—and rejected—the same arguments it finds irresistible today.  See *Federal Election Comm'n* v. *Colorado Republican Federal Campaign Comm.*, 533 U. S. 431 (2001).  The majority must overrule *Colorado II* to arrive at its outcome—so, once again, disregards and disrespects the core legal principle of *stare decisis*.  But there is a yet more important point here for the American political system: that the majority, also again, jettisons a rule needed to protect our democracy's integrity.  With respect, I dissent.

KAGAN, J., dissenting

I

A

Soon after the 1972 presidential elections, Congress set out to strengthen the Federal Election Campaign Act in response to recent revelations of *quid pro quo* corruption. One apparent exchange of campaign contributions for a public-policy favor loomed especially large. As told by the Senate Watergate Committee, the deal involved price supports for milk, worth many millions of dollars to the Nation's dairy industry. See Final Report of the Select Committee on Presidential Campaign Activities, S. Rep. No. 93–981, pp. 623, 680 (1974). Originally, the Nixon administration had decided, after lengthy deliberation, not to increase the subsidies. See *id.*, at 622, 633. But following a meeting with industry leaders, the President had a change of heart. He told his top aides to convey to the dairymen the "need to reaffirm their $2 million pledge" to his campaign "as a condition for the public announcement of [a milk subsidy] increase." *Id.*, at 648, 682; see also *id.*, at 642–643 (describing the milk producers' subsequent "middle-of-the-night rendezvous" to arrange for immediate "commitments of substantial financial contributions"). "The dairymen agreed, the announcement was made," and "the promised contributions began to flow." *Id.*, at 682. When Congress resolved, a few years later, to amend the campaign finance laws, its "primary purpose" was to prevent such "*quid pro quo* corruption and its appearance." *McCutcheon* v. *Federal Election Comm'n*, 572 U. S. 185, 197 (2014) (plurality opinion). The object was to shut down the "opportunities for abuse" associated with big campaign donations. *Buckley* v. *Valeo*, 424 U. S. 1, 27 (1976) (*per curiam*).

At the heart of the 1974 reforms were so-called "base limits"—caps on the maximum amount any donor can give to a candidate's campaign. The idea behind those limits is clear-cut. In a world where campaigning for office is expensive, candidates need financial contributions—and the

bigger, the better. To get large contributions, they may be willing to return public-policy concessions—a decision or a vote on some matter of governance. And even when that does not occur, the public can see that it might—that the incentives and opportunities are there for buying and selling policy outcomes. So Congress set strict base limits to protect both "the integrity of" and public "confidence in" our "system of representative Government." *Id.*, at 26–27. In 1974, the limit was $1,000 per election. See *id.*, at 26. Today, that limit is $3,500—or $7,000 if you count the primary and general elections together. See FEC, Contribution Limits for 2025–2026 (Jan. 30, 2025) (https://perma.cc/ 57Q5-PYKG).

This Court has long recognized that those base limits comply with the First Amendment. Preventing *quid pro quo* corruption and its appearance is an important—indeed, a "compelling"—government interest. *McCutcheon*, 572 U. S., at 199; see *Buckley*, 424 U. S., at 25–27. And the base limits are "closely drawn" to further that interest. *Id.*, at 25. They "focus[] precisely on the problem of large campaign contributions," while leaving supporters of candidates free to engage in other political activity (including small donations). *Id.*, at 28. The limits thus target the "aspect" of political life most capable of creating "the actuality and potential for corruption." *Ibid.*

And to protect the base limits from easy evasion, the Court has recognized, further regulations may also be permissible. See *McCutcheon*, 572 U. S., at 222–223; *McConnell* v. *Federal Election Comm'n*, 540 U. S. 93, 171–173 (2003); *Buckley*, 424 U. S., at 46–47. Again, the idea is straightforward. If a donor can circumvent the base limits through some type of routing mechanism, the limits will lose all their efficacy: They will become unable to prevent actual and apparent *quid pro quo* corruption. So to the extent that a campaign finance law is appropriately "tailored to the Government's interest in preventing circumvention

of the base limits," it will satisfy constitutional scrutiny. *McCutcheon*, 572 U. S., at 218. Today's majority reaffirms that point. See *ante,* at 27. For example, it describes "earmarking rules" (of which more later) as a "constitutionally permissible way for the Government to prohibit circumvention of the base limits on contributions to candidates." *Ante*, at 16 (citing *McCutcheon*, 572 U. S., at 222–223). Our difference concerns only—though this is no small "only"—whether the Government's strong interest in preventing circumvention of the base limits also justifies the coordinated-expenditure caps at issue here.

## B

The anti-circumvention principle just noted should resolve this case in favor of the caps' constitutionality. A contribution limit of $7,000 will do no good if a donor can use a political party as a conduit to give the candidate hundreds of thousands more. Congress sought to prevent that kind of evasion through the limits on a party's coordinated expenditures; and those limits are well-tailored to the statutory mission. That is all the First Amendment demands—which is why this Court upheld the same restriction against the same challenge 25 years ago in *Colorado II*.[1]

Consider first the varied forms a coordinated expenditure may take. The majority offers one example, which is least harmful to its cause but not the standard fare. A party, it

---

[1] Contrary to the majority's framing, see *ante,* at 14–15, the question here (which, to repeat, we have answered before) is not whether the caps on a party's coordinated expenditures are permissible to "prevent circumvention of the base limits" via contributions to a party that are "earmarked (*i.e.*, directed) to a candidate." The question, instead, is whether the caps are permissible to prevent circumvention of the base limits *by any means*. It is the circumvention of the base limits that is the focus of the constitutional inquiry, regardless of the means by which that takes place. And as I will discuss later, the means by which donors can use parties to circumvent base limits (absent the caps) need not rely on earmarking at all. See *infra*, at 15–17.

says, might wish to "spend money to produce and place a television advertisement in support of a candidate after consulting with the candidate's campaign about the content, timing, or placement of the advertisement." *Ante*, at 7. So it might—and in such a case the ad seems not terribly far removed from a party's independent speech on behalf of a candidate, which of course cannot be limited. See *ante*, at 6–7. That is why the majority uses the example as its lead case. More typical, though, is what happened here: The candidate's campaign, on its own, produced a political advertisement, and sent the party the invoice after the fact. The party responded, "Received. Will process"—making clear that it is less a collaborative speaker than a simple piggy bank. 1 App. 202–203; 2 *id.*, at 481. And yet a third kind of party-coordinated expenditure does not involve advertising or other speech at all. A candidate, for example, might forward the bill from his pollster; or the rent or electricity bill for campaign headquarters; or the catering bill for a campaign event. So the political party is just helping the candidate pay any of his financial obligations. That is why *Colorado II* recognized that a party's coordinated expenditures, like those from individuals or non-party groups, can be "virtually indistinguishable" from direct contributions to a candidate. 533 U. S., at 444–445; see *id.*, at 467 (THOMAS, J., dissenting) (acknowledging the point).

Because coordinated expenditures are "as useful to the candidate as cash," Congress has long recognized that, unless regulated, they will undermine contribution limits. *Id.*, at 446 (majority opinion). Consider the matter first with respect to individual and non-party group donors (the latter meaning corporate and interest groups). There is no point to the $7,000 base limit if a deep-pocketed donor can spend hundreds of thousands more to pay for campaign expenses. So the campaign finance law treats coordinated expenditures by such donors as contributions—meaning, subject to the normal base limits. See 52 U. S. C. §30116(a)(7)(B).

And this Court long ago upheld that rule, explaining that it "prevent[s] attempts to circumvent the Act through prearranged or coordinated expenditures amounting to disguised contributions." *Buckley*, 424 U. S., at 47. (The majority today does not touch that holding, see *ante*, at 26, n. 6, but a person attending to this Court's recent campaign finance decisions might reasonably beware.) Now turn to party-coordinated expenditures, where the rule is somewhat different because the problem is. The majority is right that cooperation between a party and its candidates is a generally fine thing. See *ante*, at 11. The issue arises when—and only when—the party functions as a funnel through which individuals and non-party groups can finance candidates, because then the party-mediated payments may give rise to the same corruption concerns as the donors' own payments would. So Congress provided parties with some, but strictly limited, capacity to make expenditures coordinated with their candidates. As the majority describes, the caps range from $65,300 for most House candidates to around $32 million for a presidential candidate. See *ante*, at 3; §30116(d). In Congress's view, anything more—and surely a regime with no limits—would introduce too much danger of *quid pro quo* deals between donors and candidates.

To begin to see why Congress was right, it's essential to take a look under the hood of modern fundraising (something the majority never does). Let's imagine a candidate—call him John Smith—running for President and seeking to raise as much money as he can.[2] Recall that under the

_____

[2] Although I use a presidential candidate as an example, everything about the mechanism I am about to describe holds true for House and Senate candidates as well. Candidates for lower office can—and do—take advantage of this same fundraising tool. See Brief for Campaign Legal Center et al. as *Amici Curiae* 28–29. Of course, fundraising in campaigns for lower offices, as a practical matter, involves smaller dollar amounts than in presidential campaigns. But because a dollar goes further in a campaign for lower office, a donor can also secure a *quid pro*

current base limits, an individual donor can give Smith's campaign at most $7,000 for the primary and general elections. See *supra*, at 4. But Smith can potentially get much more out of that donor by raising money alongside his party—meaning both its national and state committees. To do so, he forms what is known as a "joint fundraising committee"—named, let's say, the John Smith Victory Fund—consisting of his own campaign committee, the national party committee (the RNC or DNC), and party committees from each of the 50 States (or close to it). Under the base limits applying to parties, a national committee can accept $44,300 from an individual donor, and a state committee can accept $10,000. See FEC, Contribution Limits for 2025–2026. The great advantage of a joint fundraising committee is that it can collect contributions on behalf of all 52 of its component committees via a single payment: The donor writes one check to the John Smith Victory Fund for the total amount he can contribute to all the committees. The numbers add up. Fifty times $10,000 (the state committee cap) is $500,000. And when the permitted contributions to the national committee ($44,300) and Smith's own campaign committee ($7,000) are added in, a single donor can cut a check to the John Smith Victory Fund for over $550,000 ($551,300, to be precise).

The lion's share of that money typically gets pooled within short order in the national party committee's coffers. It takes a couple of steps. First, the John Smith Victory Fund parcels the money out to its member committees, in accordance with the contribution limits. That means the national party gets $44,300, and the state parties each get $10,000. But then most state parties quickly transfer their $10,000 payment to the national party, sometimes the same

_____

*quo* with less money. So the potential for corruption is, generally speaking, the same.

day.[3] See §30116(a)(4) (authorizing unlimited transfers between state and national committees of a political party). The upshot is that most of a big donor's $550,000 check to the John Smith Victory Fund soon ends up in the national party committee's hands. Then the key question becomes: What can the party do with that money?

Before today, the answer was: Many things, but very little to pay John Smith's campaign bills. Campaign finance law limits to a bare minimum ($5,000 per election) the amount a party can simply give to a candidate, so direct transfers are not an option. See §30116(a)(2). Similarly, the caps on coordinated expenditures are set so low in comparison with a campaign's total expenses as to make that spending stream inconsequential. See *supra*, at 7; Brief for Federal Respondents 21 (noting, for example, that party-coordinated expenditures in House races have never exceeded 1% of total campaign spending). That means the overwhelming majority of the contributions the John Smith Victory Fund collects—again, before today's decision—will go to party spending that only incidentally (even if meaningfully) benefits the candidate. The money may be spent, for example, on improving get-out-the-vote operations; covering the party's administrative costs; or supporting down-

——————

[3] See, *e.g.*, Levine, Soft Money Is Back ("[S]tate Republican parties transferred nearly every dollar they received from the Trump Victory Committee to the RNC"); K. Vogel & I. Arnsdorf, Clinton Fundraising Leaves Little for State Parties, Politico, May 2, 2016 (The vast majority of the millions that the Hillary Victory Fund gave state parties was "quickly transferred to the DNC, usually within a day or two"); K. Evers-Hillstrom, Trump Raised Record Money for State Parties, Then His RNC Took It Back, OpenSecrets, Feb. 24, 2021 ("On Oct. 15, the Alaska Republican Party received nearly $2.7 million from Trump Victory. The same day, it transferred the exact same sum back to the RNC"); *ibid.* ("The Nebraska Democratic Party transferred $4.3 million to the DNC on Oct. 22, one day after it received the exact same total from the Biden Victory Fund"); *ibid.* ("Dozens of state parties in deep red or blue states employed the exact same strategy").

ballot candidates. Or else the money may be spent on independently produced advertisements. But what the money is not helpful for is funding John Smith's own campaign activities, of whatever kind.

Today, that constraint disappears. With no limits on coordinated expenditures, the party can serve as the candidate's checking account. It can pay for everything John Smith (or any other candidate) needs—advertising of course, but also more prosaic things like catering, rent, and utilities. See *supra*, at 5–6. So the party can take any or every one of those $550,000 checks it receives from the John Smith Victory Fund—which, recall, the Fund has received from an individual or a corporate or interest group—and convert the money (in full) into a direct benefit for the candidate. What is supposed to be just the sum of an individual or group's capped donations to 51 separate party committees instead goes in a single straight shot to John Smith, the candidate. And then that can happen again and again and again.

It does not take much imagination to see how that scheme circumvents the contribution limit for a candidate, and raises the risk of both actual and apparent *quid pro quo* corruption. On a formal level, all base limits are complied with—$7,000 to the candidate, $10,000 each to state party committees, and $44,300 to the national one. Except that in the real world, the candidate can get all the money for his own campaign. So an ostensibly capped contribution of $7,000 becomes . . . a $550,000 contribution (again, $551,300 to be precise) to John Smith. And of course everyone knows this. The candidate recognizes both what the $550,000 contribution will do for him and where it originally came from. The donor understands the main points too. His measly $7,000 was not likely to have bought from the candidate anything of consequence. But $550,000 is a whole different story. And even if John Smith and all his wealthy donors remain scrupulously above board, the

public can see all the opportunities and incentives in the system for political corruption. At least apparent *quid pro quos* will be perceived all around. In short, as the political party becomes the conduit for oversized donations to a candidate, the constraints on actual and apparent corruption once offered by the base limits effectively disappear.

None of this is a new insight. (Indeed, to call it even an old insight is to understate its obviousness.) Some 25 years ago, this Court in *Colorado II* upheld limits on a party's coordinated expenditures against a First Amendment challenge identical to the one presented here. 533 U. S., at 465. And the Court did so on exactly the grounds I have laid out above—because "unlimited coordinated spending by a party raises the risk of corruption (and its appearance) through circumvention of valid contribution limits." *Id.*, at 456. In so holding, the Court recognized the strong role parties play in politics, and reaffirmed its holding that a party's independent expenditures could not constitutionally be limited. See *id.*, at 444. But the Court drew a sharp line between those expenditures and a party's coordinated ones, based on their value to the candidate's campaign. "[A] party's coordinated expenditure," we explained, was functionally the same as "a direct party contribution to the candidate." *Id.*, at 464. And because that was so, "a party's right of unlimited coordinated spending would attract increased contributions to parties" as a way for a donor to pass on funds to a potential office-holder. *Ibid.* With that predictable outcome, base "contribution limits would be eroded." *Id.*, at 457. And as those limits became more fictitious than real, the danger would grow of donors and candidates striking "*quid pro quo* agreements." *Id.*, at 441.

The only real-world change that has happened since then is that the danger is now still larger. That is because, put simply, this Court has ensured that the numbers are still bigger. For years, campaign finance law imposed "aggregate limits" on the amount a donor could give to federal

candidates and party committees in a two-year election cycle. In 2013-2014, for example, that limit was $123,200—far below the $551,300 payment described above. But in *McCutcheon* v. *Federal Election Comm'n*, this Court (true to form) invalidated the aggregate limit. 572 U. S., at 193. It is because of that change that a single donor, working through a joint fundraising committee, can now route as much as $551,300 to a single candidate. See *supra*, at 8. To permit that to happen, candidates from both parties have sought to make their joint committees as large as possible (a development the *McCutcheon* majority dismissed and the *McCutcheon* dissent foretold, see 572 U. S., at 214, 216; *id.*, at 247–248 (Breyer, J., dissenting)).[4] And with that structure in place, a donor now has at hand a mechanism to funnel to a candidate about 80 times what the base limits say should be the maximum. More than ever, then, caps on a party's coordinated expenditures are needed to stop *quid pro quo* corruption.

––––––––––

[4] The *McCutcheon* majority described as "divorced from reality"—and "foreclose[d]" by "experience and common sense"—the scenario of "a donor giv[ing] a $500,000 check to a joint fundraising committee composed of a candidate, a national party committee, and most of the party's state party committees." 572 U. S., at 214, 216. Tell that to candidate Kamala Harris, who had a joint fundraising committee (the Harris Victory Fund) consisting of her own campaign, the DNC, and 50 state party committees. Or to candidate Donald Trump, whose joint fundraising committee (the Trump 47 Committee, Inc.) included his own campaign, the RNC, and 48 state party committees. (He was missing Hawaii and Vermont.) As reflected in the FEC's online database, www.fec.gov/data, each of their joint fundraising committees received checks from multiple donors maxing out their party contributions, which after a pair of transfers wound up at the DNC or RNC. See *supra*, at 9, n. 3; FEC, Contributions to Harris Victory Fund (https://perma.cc/K8GB-WWGY); FEC, Disbursements of Harris Victory Fund (https://perma.cc/H3V4-DJVQ); FEC, Receipts of DNC (https://perma.cc/T93L-WVA7); FEC, Contributions to Trump 47 Committee, Inc. (https://perma.cc/R9CE-43QU); FEC, Disbursements of Trump 47 Committee, Inc. (https://perma.cc/2SSA-6XA4); FEC, Receipts of RNC (https://perma.cc/49P8-9BSN).

## II

To overturn a precedent like *Colorado II*, this Court used to insist that a "special justification," above and beyond simple error, is needed. *E.g., Halliburton Co.* v. *Erica P. John Fund, Inc.*, 573 U. S. 258, 266 (2014). *Stare decisis*, after all, "promotes the evenhanded, predictable, and consistent development of legal principles, fosters reliance on judicial decisions, and contributes to the actual and perceived integrity of the judicial process." *Payne* v. *Tennessee*, 501 U. S. 808, 827 (1991). It also encourages judicial humility, which is all too often in short supply. Yet the majority could hardly be more dismissive of the "special justification" requirement for overruling precedent. See *ante,* at 22. The majority would much rather explain why it thinks settled law is wrong than go to the trouble of establishing what it should—an unusual need to start all over.

So today's supposed *stare decisis* analysis mainly just recounts why the majority, had it been the majority in 2001, would have decided *Colorado II* differently. Almost to flaunt the point, the analysis gives pride of place to JUSTICE THOMAS's dissent in that case; if only the rest of the majority had been there to join him! See *ante*, at 23. Today's decision thus can join the parade of those recently overruling established law because of a new majority's new outlook on a consequential matter. Here, the subject is campaign finance law. See also *Citizens United* v. *Federal Election Comm'n*, 558 U. S. 310, 319 (2010) (overruling *Austin* v. *Michigan Chamber of Commerce*, 494 U. S. 652 (1990); overruling in part *McConnell*, 540 U. S., at 203–209); *McCutcheon*, 572 U. S., at 202, 204 (overruling in part *Buckley*, 424 U. S., at 38); cf. *Federal Election Comm'n* v. *Ted Cruz for Senate*, 596 U. S. 289, 313 (2022) (invalidating 52 U. S. C. §30116(j)); *Davis* v. *Federal Election Comm'n*, 554 U. S. 724, 744 (2008) (invalidating §30117). For those who think there is too much of it in this country—for those who would prefer even more money to be pumped even more

easily into politics despite the danger of corruption—this overruling is for you.

The majority, to be sure, eventually proposes three changed circumstances (two legal, one factual) to support its holding—but none lives up to the billing. First, the majority contends that the *Colorado II* Court applied a standard of review more deferential than the one now used. See *ante*, at 23. But that is not so: *Colorado II* used the standard recognized as appropriate for the last 50 years. It asked "whether the restriction is 'closely drawn' to match what we have recognized as the 'sufficiently important' government interest in combating political corruption." 533 U. S., at 456; see *Buckley*, 424 U. S., at 25 (same); *McCutcheon*, 572 U. S., at 197 (same). In fact, even today's majority ends up using that standard. See *ante*, at 10 (noting that the difference between it and some supposedly different test is "subtle" and in the end "academic"). Second, the majority faults the *Colorado II* Court for recognizing "undue influence" as a form of political corruption. See *ante*, at 11–12, 24. And so it did, in a parenthetical in the opinion's background section, but not in any way that matters here: The Court's holding was explicitly and exclusively based on the risk that a party's coordinated expenditures pose the "danger" that money will be "given as a *quid pro quo* for improper commitments." *Colorado II*, 533 U. S., at 464.

And third, the asserted factual change: the majority laments that "political parties' relative power has substantially diminished in comparison" to "Super PACs and other outside groups" that can "receive and spend unlimited money" on political campaigns. *Ante*, at 24–25; see *ibid.* ("*Colorado II* contributed in part to that shift"). But surely, that one is rich. If one is overruling—or just reversing—decisions on that ground, I can think of a couple of more obvious ones—that is, the ones that created the modern Super PAC system, and thus the complained-of imbalance. See *Citizens United*, 558 U. S. 310; *SpeechNow.org* v.

*Federal Election Comm'n*, 599 F. 3d 686 (CADC 2010) (en banc). In any event, the majority's new equilibrium the-ory—overrule *Colorado II* to restore the parties' proper role in American politics—is, shall we say, seat-of-the-pants. I suspect it will not be difficult in a decade or two to disprove the majority's view that what has been standing in the way of a fully functional party system is *Colorado II.*

But there is no need to belabor the majority's failures re-specting *stare decisis* because today's decision is wrong even if the Court were appropriately starting from scratch. The challenge for the majority is to explain how to prevent cir-cumvention of the base contribution limits without the lim-its on a party's coordinated expenditures in place. The ma-jority takes some time to get around to that undertaking; it first wends its way through no less than three strawman arguments. See *ante*, at 10–13; see, *e.g.*, *ante*, at 10 ("[N]o one actually invokes or defends" such an argument). And one can see why the majority is stalling: Once it gets to the crucial question, it has no satisfying account to offer. The majority places all its hopes on two alternative "prophylac-tic measures": earmarking rules and disclosure require-ments. *Ante*, at 21. But those two measures alone are in-sufficient to the task. Without caps as well, they can be thought enough only when taken with generous doses of ei-ther willful blindness or wishful thinking.

Start with earmarking rules—both what they apply to and what they do not. As the majority explains, the law will treat a contribution to a party as instead a contribution to a candidate if the donor earmarks or otherwise directs the money in that direction. See *ante*, at 16. So if a donor giv-ing money to a party says "I want you to send this on to John Smith," that money will count as a contribution to John Smith, and will be subject to the base limit of $7,000 for donations to candidates. (Of course, that means the do-nor can only earmark funds up to $7,000.) But suppose the donor, with no such instruction, just sends a $550,000 check

to the John Smith Victory Fund I have described above? That payment is, according to campaign finance law, all well and good: None of it counts as an earmark. So the mechanism I outlined above—the $550,00 is given to the Victory Fund, then gets disbursed to state party committees, then gets pooled in the national party committee, then is used to pay the candidate's bills—is entirely unaffected by earmarking rules. That means a donor, regardless of those rules, can pay $550,000 to support the candidate's campaign (despite the $7,000 base limit)—with all the opportunities for political corruption that such outsized donations raise.[5]

Perhaps the majority thinks (I am guessing here, given the majority's unwillingness to deal in the specifics of campaign finance) that no *quid pro quo* can occur in the above scenario because the $550,000 payment to the Victory Fund is unaccompanied by directions to use the money for the candidate. If so, that would be wrong. Suppose John Smith says to a donor: "If you give money to my Victory Fund, I will subsidize your latest venture" (or if John Smith were a Congressman, "I will vote to subsidize the venture"). And then the donor gives that money, without any earmark. That is a *quid pro quo*, pure and simple: The donor is making a requested payment to the candidate's joint fundraising committee in exchange for an official act. The donor does not need to say any earmarking words. In fact, he does not even need to understand the campaign finance plumbing that will eventually make the money available for Smith's own use. And if the majority then protests that a

_____

[5] That is why, as I noted earlier, "the means by which donors can use parties to circumvent base limits (absent the caps) need not rely on earmarking at all." See *supra*, at 5, n. 1. And it is why, as I also noted, the majority is wrong to frame the inquiry as whether the caps on a party's coordinated expenditures prevent circumvention by earmarking, rather than circumvention through any (including non-earmarking) means. See *ibid.*

candidate would not think that *quid pro quo* worthwhile because he could not be 100% certain that 100% of the money would return to him, cf. *ante*, at 13–14, 17, that objection would also be mistaken. Parties have substantial incentives to ensure that a candidate can use (and use directly) most of the money he raises for his joint committee—not least of which is getting a proficient fundraiser-candidate, who has procured the money in the first place, elected to office. Perhaps the party will take some amount off the top. But in the ordinary case, nowhere near enough to bring a $550,000 donation to anything like the $7,000 base limit. Which means that earmarking rules will do nothing to prevent the circumvention of base limits—and the attendant risk of corruption.[6]

Something I said before applies here too: None of this is a new insight, even if the mechanics of campaign finance are constantly evolving. See *supra*, at 11. *Colorado II* made basically the same point about the limits of earmarking rules, even before joint fundraising committees became so

---

[6] The majority's only response is that *McCutcheon*, in ruling on aggregate limits, "rejected a similar circumvention argument," *ante,* at 26—but that claim way overreaches. *McCutcheon* did not, as the majority implies, find joint fundraising committees generally impervious to efforts to circumvent contribution limits. Instead, its discussion focused on a single hypothetical, offered by the District Court, about a circumvention scheme involving "illegal earmarking." 572 U. S., at 215. In that example, the donor did more than write a check to the joint committee; he also directed the party committees first receiving the money to reroute it to the candidate. See *ibid*. *McCutcheon* responded that because such directions would run afoul of the earmarking regulations, party committees were unlikely to agree to such a "transparent violation" of those rules. 572 U. S., at 215. Possibly so (though *McCutcheon* is not otherwise known for the accuracy of its predictions, see *supra*, at 12, and n. 4). But as I have just explained, no such violations are needed to utilize joint fundraising committees as a mechanism for skirting base limits and making *quid pro quo* deals. See *supra*, at 16. Nothing in *McCutcheon* holds that such earmark-free schemes do not present a circumvention— and hence a corruption—problem all on their own.

prominent. Those rules, the Court explained, can "reach only the most clumsy attempts to pass contributions through to candidates." 533 U. S., at 462. To rely on them is thus to ignore the "practical difficulty" of "combating circumvention under actual political conditions." *Ibid.* Just so. A Court serious about preventing that evasion, as *Colorado II* concluded (and as the *Colorado II* Court *was*), would refuse to treat "the earmarking provision as the outer limit of acceptable" regulation. *Ibid.*

The majority's second prophylactic reed—disclosure requirements—is even weaker. Here, the majority heralds the wonders of "modern technology," which allows "massive quantities of information [to] be accessed at the click of a mouse." *Ante*, at 16–17. But to what end exactly? It is good that voters can learn of the size of contributions—including substantial ones to fundraising committees. But that information does not reveal *quid pro quo* dealing, and so cannot adequately deter it. That is why this Court in *Buckley* held that although disclosure requirements were "salutary" measures, they could not possibly take the place of contribution limits. 424 U. S., at 28; see *ibid.* ("[C]orruption [is] inherent in a system permitting unlimited financial contributions, even when the identities of the contributors and the amounts of their contributions are fully disclosed"). And if disclosure cannot take the place of contribution limits themselves, it also cannot substitute for the coordinated-expenditure caps that protect those limits from circumvention. To count on disclosure to prevent corruption is as much as to give up on the goal itself.

Which is, sad to say, what this Court does today. A quarter century ago, *Colorado II* recognized that a party's coordinated expenditures, if left unrestricted, were "tailor-made to undermine contribution limits." 533 U. S., at 464. That is even more true now than it was then. See *supra*, at 11–12. Those expenditures enable parties to funnel to candidates oversized contributions—massively in excess of the

$7,000 base limit.  And with that pass-through mechanism comes the danger of *quid pro quo* corruption—as if the base limit itself were half a million dollars.  Congress, consistent with the First Amendment, can hold the line at $7,000.  And so too, Congress can cap the coordinated payments capable of obliterating that line.  By holding otherwise, the majority ushers in untold harm.

When this Court in *McCutcheon* invalidated aggregate limits, Justice Breyer wrote in dissent: "[T]oday's decision eviscerates our Nation's campaign finance laws, leaving a remnant incapable of dealing with the grave problems of democratic legitimacy that those laws were intended to resolve."  572 U. S., at 233.  I'm not sure what to call a remnant of a remnant, but that is what the Court has left today.  And the result will be what Justice Breyer warned of: a legal regime increasingly unable to stop political corruption, and thus to preserve our institutions' democratic legitimacy.